IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-00134-RN

**Douglas Pettaway,**

    Plaintiff,

v.

**Nancy A. Berryhill**, Acting
Commissioner of Social Security,[1]

    Defendant.

**Memorandum & Order**

Plaintiff Douglas Pettaway instituted this action on March 29, 2016, to challenge the denial of his application for social security income. Pettaway claims that the Administrative Law Judge ("ALJ") James Williams erred in evaluating the medical evidence opinion evidence. Both Pettaway and Defendant Nancy Berryhill, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 18, 24.

After reviewing the parties' arguments, the court has determined that ALJ Williams properly evaluated the medical opinion evidence and accorded it the appropriate weight. Therefore, the undersigned magistrate judge denies Pettaway's motion, grants Berryhill's motion, and affirms the Commissioner's determination.[2]

---

[1] Berryhill replaced Carolyn Colvin as the Acting Commissioner of Social Security on January 20, 2017.

[2] The parties have consented to jurisdiction by a United States Magistrate Judge. 28 U.S.C. § 636(c). D.E. 16.

I.      **Background**

On March 10, 2014, Pettaway filed applications for disability benefits and supplemental security income. In both applications, Pettaway alleged a disability that began on December 4, 2013. After his claims were denied at the initial level and upon reconsideration, Pettaway appeared at a hearing before an ALJ Williams on January 5, 2016, to determine whether he was entitled to benefits. ALJ Williams determined Pettaway was not entitled to benefits because he was not disabled. Tr. at 9–21.

ALJ Williams found that Pettaway had the following severe impairments: ischemic heart disease, obesity, degenerative disc disease ("DDD"), right rotator cuff tear, affective disorder, hypertension, hyperlipidemia, and diabetes mellitus ("DM"). *Id.* at 11. ALJ Williams found that Pettaway's impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 12. He then determined that Pettaway had the RFC to perform light work with limitations. *Id*. at 14. He must have the opportunity to alternate to sitting for an hour after every hour of standing. *Id*. Pettaway is limited to frequent reaching overhead and in all other directions on the right. *Id*. He should never climb ladders or scaffolds, he can frequently stoop, and he can occasionally crawl. *Id*. Additionally, Pettaway is limited to performing simple, routine, repetitive tasks. *Id*.

ALJ Williams concluded that Pettaway is unable to perform his past relevant work as a machinist or stocker but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Pettaway is capable of performing. *Id*. at 20. These jobs included: remnant sorter, baker worker, and laundry classifier. *Id*. at 21. Thus, ALJ Williams found that Pettaway was not disabled. *Id*.

After unsuccessfully seeking review by the Appeals Council, Pettaway commenced this action on March 29, 2016. D.E. 6.

## II. Analysis

### A. Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to

determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Background

Pettaway has a history of back and leg pain. He had two coronary stents placed in September 2010. Tr. at 487. In July 2012, he was seen for chest pain and substance abuse. *Id*. at 500. An echocardiogram revealed left ventricle hypertrophy, with an ejection fraction of 55–60%. *Id.* at 497–98.

Thereafter, in March 2013, Pettaway sought treatment for numbness in his left hand and pain in his neck and shoulder. *Id*. at 535–36. The assessment was hypertension, coronary artery disease with two stents, back pain with radiculopathy, and mild carpal tunnel syndrome on the left side. *Id*. at 452–53. Pettaway reported chest pain in August 2013, and reported back pain the following month. *Id*. at 460, 468.

Pettaway complained of shoulder and hip pain in March 2014, and a decrease in range of motion ("ROM") was noted upon examination. *Id*. at 473. That same month, he sought orthopedic care for his right shoulder pain and back pain. *Id*. at 430. Providers assessed right rotator cuff tear with fatty degeneration and atrophy, for which he received an injection to the right shoulder. *Id*. at 429–30. Providers opined that he may need surgery at some point. *Id*. at 431. Examination also revealed a positive straight leg raise on the left side and decreased sensation in the dorsum of the foot. *Id.* at 430.

The following month, Pettaway sought treatment for hypertension, shoulder pain, and back pain. *Id.* at 477. He reported that Percocet helped with his pain, and he received a prescription refill. *Id.* at 477–78.

That same month, Pettaway also saw Elwood Moore, a certified physicians' assistant, with Eastern Neurosurgical & Spine. *Id.* at 435. They discussed the results from a previous MRI which revealed lumbar spondylosis with stenosis at L4-5 and L5-S1 as well as lower left extremity radiculopathy. *Id.* at 436. Epidural steroid injections and surgery were discussed, but Pettaway reported that he lacked funding for either treatment. *Id.*

In May 2014, Pettaway reported right shoulder pain, and examination revealed diffuse tenderness along the lumbar spine and limited ROM in the right shoulder. *Id.* at 622. Pettaway also presented to the Emergency Department twice that month for left leg pain and shoulder pain. *Id.* at 638, 643.

Pettaway underwent a consultative examination with Dr. Jennifer Stahl in June 2014. *Id.* at 628–36. Dr. Stahl noted tenderness to palpitation at the shoulder and lower lumbar spine. *Id.* at 631. She opined that Pettaway would have limitation with reaching on the right side. *Id.* at 634.

In July 2014, Pettaway reported to the Emergency Department for chest pain. *Id.* at 648. Records reflect that he appeared to be depressed and using alcohol and illicit drugs. *Id.* at 661. Testing revealed coronary artery disease. *Id.* at 664. The following month, Pettaway again sought treatment for back and right upper extremity pain. *Id.* at 715. Savannah Junkins, a certified physicians' assistant at Opportunities Industrialization Center ("OIC"), noted fatigue, weakness, decreased ROM, and joint pain. *Id.* at 716. Later that month, she noted he had an antalgic gait. *Id.* at 703. Pettaway reported back pain, left leg pain, and numbness in October 2014. *Id.* at 700.

Junkins authored a letter stating that Pettaway had multiple chronic conditions including lumbar disc disease with back pain, hypertension, coronary artery disease, and diabetes. *Id*. at 698.

Junkins examined Pettaway again in December 2014 for back pain and hypertension. *Id*. at 733. She wrote that month that he was experiencing worsening back pain and leg pain, especially in the left leg, with paresthesia and numbness. *Id*. at 726–28.

DeFonda McQueen, Pettaway's case manager at the homeless shelter where he resided, wrote a letter in June 2015 noting that Pettaway's health had continued to deteriorate. *Id*. at 190. The following month, Pettaway returned to Junkins inquiring about a cane. *Id*. at 754. She advised that he could purchase one at Walmart or a pharmacy. *Id*. at 755.

In August 2015, Pettaway visited the Emergency Department for back pain resulting from a fall. *Id*. at 763. Testing revealed multilevel degenerative disc disease, most prominent at L5-S1, and mild degenerative changes and arterial vascular calcification in the left hip. *Id*. at 766, 768. He returned to the Emergency Department the following week for back pain. *Id*. at 770.

Pettaway sought treatment for back pain in September 2015, and again in November 2015 for back pain radiating into his left leg. *Id*. at 774, 780. Jessica Rodriguez, a certified physicians' assistant at OIC, treated Pettaway in November 2015. *Id*. at 750. She noted that he used a cane and had a limp that favored his right side. *Id*. The following month, Rodriguez wrote a letter based on a March 2014 MRI opining that he had worsening back and leg pain, especially in his left leg. *Id*. at 784.

### D.     Medical Opinion Evidence

Pettaway asserts that ALJ Williams's assessment of the medical opinions is unsupported by the record. Specifically, he contends that ALJ Williams failed to accord sufficient weight to

6

the opinions of physicians' assistants Junkins and Rodriguez and instead assigned more weight to state agency physician Dr. Swann and consultative examiner Dr. Stahl. Pettaway also objects to ALJ Williams's finding that he did not require a cane, and to his consideration of a Third Party Function Report and GAF scores.[3] The Commissioner maintains that substantial evidence supports ALJ Williams's consideration of this expert evidence. The court finds that ALJ Williams provided a rational basis for the weight he gave to the medical opinion evidence. Accordingly, there is no error in the analysis of such evidence.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006), he must nevertheless explain the weight accorded such opinions. *See* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(c). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his

---

[3] These two issues are raised, but not addressed with any detail, in Pettaway's supporting memorandum.

opinion is given. *See id*. § 404.1527(c)(3). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See id*. § 404.1527(c)(4).

According to 20 C.F.R. § 404.1527(c)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ alone. *See* 20 C.F.R. § 404.1527(d)(1).

### 1. Physicians' assistants

Pettaway first maintains that ALJ Williams erred in failing to afford more weight to the opinions of Junkins and Rodriguez, both physicians' assistants. ALJ Williams noted that neither physicians' assistants, are "acceptable medical sources" under the Regulations. Tr. at 18. He further remarked that these providers offered opinions on issues reserved to the Commissioner and, in all but one instance, failed to cite treatment records to support their opinions. *Id*. He further found that their assessments were inconsistent with the overall medical record reflecting controlled hypertension and diabetes, cardiovascular conditions that have not caused Pettaway significant problems, and pain that was controlled with medication. *Id*.

The Regulations require an ALJ to consider all medical evidence, regardless of its source. 20 C.F.R. § 404.1513; SSR 06–39 at *4 (the regulations require an ALJ to consider evidence, including opinions, from "other sources."). As a certified physicians' assistants, Junkins and Rodriguez qualify as "other sources" as opposed to an "acceptable medical source." 20 C.F.R. § 1513.[4]

The Regulations advise that evidence from "other sources" may be used to show impairment severity and its impact on an ability to work. *Id.*; SSR 06–3p, 2006 WL 2329939, at *3 (noting that opinions from health care providers who are not acceptable medical sources, including licensed clinical social workers, "are important and should be evaluated on key issues such as impairment severity and functional effects"). The same factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other "acceptable medical sources") apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"). *See* SSR 06–03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006) (noting that information from other sources cannot establish the existence of a medically determinable impairment but may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.); *see also* 20 C.F.R. §§ 404.1527(c) (evaluation of medical opinions), 416.927(c) (same), 404.1513(d) (partial listing of "other sources"), 416.913(d)(1) (same).

Thus, while ALJ Williams was not required to accept Junkins or Rodriguez's assessments, their lack of status as an "acceptable medical source" is not a basis to discredit their

---

[4] While it does not impact this claim, for applications filed after March 27, 2017, physicians' assistants are now considered acceptable medical sources for impairments within their licensed source of practice. *See* POMS DI 22505.003 Evidence from an Acceptable Medical Source (AMS).

records and findings altogether as they offer additional insight into Pettaway's status. Here, ALJ Williams offered additional evidence that the opinions of these providers deserved little weight.

ALJ Williams noted that, in most instances, Junkins and Rodriguez failed to correlate their findings to treatment records and that they offered their conclusions on the ultimate issue of disability, a finding reserved to the Commissioner. Tr. at 18. ALJ Williams also determined that their assessments were inconsistent with the overall medical record reflecting conditions that were under control or posed little problems to Pettaway. *Id.* For example, Junkins opined that Pettaway could sit or stand for only 15 minutes at a time and could not lift more than five pounds. *Id*. at 738. However, Dr. Stahl concluded that he could sit, stand, and walk normally throughout an eight hour workday and that he had no significant limitations in lifting or carrying. *Id*. at 634. Similarly, Pettaway's own reports indicate that he could sit for one hour, stand 30–40 minutes, walk a half block, and lift or carry ten pounds frequently or 20 pounds occasionally. *Id*. at 629. In sum, ALJ Williams offered proper reasons to afford little weight to the opinions of these providers.

### 2. Dr. Swann

Pettaway next maintains that ALJ William's erred in affording great weight to the assessment of state agency physician, Dr. Edwin Swann, because he did not examine him and lacked Pettaway's complete medical file. *Id.* at 18. The Commissioner asserts, and this court agrees, that substantial evidence supports ALJ William's consideration of Dr. Swann's findings.

The Commissioner typically affords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996) (if a treating source's medical opinion is "well-supported and not

inconsistent with the other substantial evidence in the case record, it must be given controlling weight"). A treating physician's opinion is not due controlling weight, however, when "it is not supported by clinical evidence or if it is inconsistent with other substantial evidence." *Craig*, 76 F.3d at 590.

With respect to state agency physicians, the Regulations recognize that these individuals are "highly qualified ... experts in Social Security disability evaluation[.]" 20 C.F.R. § 416.927(e)(2)(i). It is within the discretion of the ALJ to give greater weight to a non-treating state agency physician, particularly when the opinion of the non-treating physician is supported by substantial evidence or there is persuasive evidence contrary to the opinion of a treating physician. *Williams v. Astrue*, No. 3:11-CV-764-HEH, 2012 WL 5361032, at *13 (E.D. Va. Oct. 16, 2012) *adopted by*, No. 3:11CV764-HEH, 2012 WL 5361014 (E.D. Va. Oct. 31, 2012) (finding that the ALJ did not err in giving greater weight to opinions of non-treating physicians when substantial evidence in the record supported the opinions); *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir. 1992) (per curiam) (finding that "the ALJ was within his discretion in giving [non-treating physician's] testimony greater weight. ..."), *superseded in nonrelevant part by* 20 C.F.R. § 404.1517(d)(2).

Dr. Swann concluded that Pettaway was somewhat limited in his right arm, which resulted in a restriction to frequent but not constant overhead reaching on that side. *Id*. at 110. Dr. Swann also found that Pettaway did not require a cane. *Id*. at 109. ALJ Williams gave this assessment great weight, finding it was consistent with the record as a whole which demonstrated no substantially debilitating impairments. *Id*. at 18. In particular, Dr. Swann's opinion was supported by Dr. Stahl, who likewise concluded that Pettaway did not require a cane

and that he could provide frequent actions with his right upper extremity.[5] Additionally the overall record reveals that Pettaway often had generally normal exam findings which included normal gait and full or almost full strength. Moreover, ALJ Williams recognized Pettaway's conditions resulted in function limitations as reflected in his RFC which limited Pettaway to alternate sitting and standing every hour and limited him to only frequent reaching overhead and in all other directions on the right. *Id*. at 14.

Moreover, Dr. Swann noted Pettaway's degenerative disc disease, spinal stenosis, and torn rotator cuff. *Id*. at 98. Pettaway has not identified other evidence available to Dr. Swann that should have been considered.

Finding no error with ALJ William's consideration of Dr. Swann's assessment, which is supported by substantial evidence, Pettaway's argument on this issue is rejected.

### 3. Dr. Stahl

Pettaway asserts that Dr. Stahl's assessment did not deserve the partial weight ALJ Williams afforded to it because it was internally inconsistent. Dr. Stahl found that Pettaway had no manipulative limitations in reaching, handling, fingering, and grasping. *Id*. at 634. Dr. Stahl noted that Pettaway would be able to perform these activities frequently, which is a limitation on the duration he could engage in manipulative movements. *Id*. ALJ Williams noted this inconsistency in Dr. Stahl's findings. *Id*. at 16.

An ALJ is not bound to accept or adopt all the limitations set out in a medical opinion when determining how much weight to accord to it. *See Bennett v. Colvin,* No. 3:13-CV-01176, 2015 WL 153950, at *13 (M.D. Tenn. Jan. 12, 2015) (holding that ALJ who accords great weight to opinion not required to adopt that opinion wholesale); *Razey v. Colvin*, No. 14-23,

---

[5] As discussed below, Dr. Stahl's findings on Pettawy's manipulative abilities with his right upper extremity was not given any weight because her report contradicted this finding by also stating that there were no limitations in this area of functioning.

2014 WL 4792150, at *2 (W.D. Pa. Sept. 23, 2014) (ruling that ALJ not required to adopt a medical opinion wholesale); *Lambert–Newsome v. Astrue*, No. 11-1141-CJP, 2012 WL 2922717, at *6 (S.D. Ill. July 17, 2012) (noting that merely because ALJ gave great weight to an opinion "does not mean he was required to adopt it wholesale"); *Irvin v. Astrue*, No. EDCV 11-23-AJW, 2012 WL 870845, at *2–3 (C.D. Cal. March 14, 2012) (finding that, although ALJ gave great weight to medical source opinion, he did not err in implicitly rejecting one limitation from that opinion); *Armentrout v. Astrue*, No. 3:10-cv-504, 2011 WL 4625931, at *7 (E.D. Va. June 2, 2011) ("While the ALJ assigned 'significant' probative weight to the opinion, the ALJ was not then required to adopt every limitation and incorporate them into the RFC analysis."), *adopted by,* 2011 WL 4625912 (E.D. Va. Oct. 3, 2011).

Here, ALJ Williams found Dr. Stahl's assessment with respect to Pettaway's manipulative functions to be inconsistent. Tr. at 16. Accordingly, he assigned that determination no weight. *Id*. Nonetheless, ALJ Williams also concluded that Dr. Stahl's findings as to Pettaway's abilities to sit, stand, walk, lift, and carry were supported by both her examination as well as the longitudinal medical record. *Id*. Because an ALJ is not obligated to accept all findings set forth in a medical opinion to which he assigns weight, he did not err in affording some weight to parts of Dr. Stahl's review and adopting her well-supported opinions, while also rejecting other portions of her assessment. According, Pettaway's claim on this issue lacks merit.

### E.     Cane

Pettaway also disputes ALJ Williams's consideration of his use of a cane. "The requirement to use a hand-held assistive device may ... impact ... [an] individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." 20 C.F.R. Part 404, Subpt. P, App. 1, §

1.00J4. Thus, an ALJ is required to consider the impact of "medically required" hand-held assistive devices. *Eason v. Astrue*, No. 2:07–CV–30–FL, 2008 WL 4108084, at *16 (E.D.N.C. Aug. 29, 2008); SSR 96–9, 1996 WL 374185, at *7 (July 2, 1996).

A hand-held assistive device is "medically required" if "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96–9p, 1996 WL 374185, at *7. Whether the need for a hand-held assistive device impacts functional capacity depends upon the particular circumstances of the case. For example, an individual who requires a hand-held assistive device in one hand for purposes of walking may be able to use the other hand to perform requirements of many occupations. *Id*. "On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities ... may be significantly eroded." *Id*.

As noted above, Pettaway asked Junkinss about a cane, and she advised he could buy one without a prescription. He contends a cane was necessary, and that a prescription for one would have been futile because he lacked insurance coverage.

Despite this argument, ALJ Williams concluded that Pettawy's cane was not necessary. He remarked that Dr. Stahl's notes reflect that Stahl presented to the examination using a cane but that he was able to walk around the room without it. *Id*. at 15. She observed a normal gait and opine that he could sit, stand, and walk normally in an eight-hour workday. *Id*. She further determined that he did not need a cane to walk. *Id*. ALJ Williams agreed with these findings. *Id*. at 16. As there is substantial evidence supporting ALJ Williams's finding that Pettaway could ambulate without a cane, the court finds no error in his analysis on this issue.

### F. Other Evidence

#### 1. Third party function report

Pettaway also objects to ALJ Williams's consideration of a Third Party Function Report submitted by his friend, Ashley Farmer. Tr. at 295–301. Farmer reported that Pettaway's pain interfered with his ability to sleep, he could stand for only five minutes, cannot sit for long periods, and that he cannot drive. *Id*. ALJ Williams gave little weight to this assessment, noting that Farmer is not medically trained to make exacting observations and that she is not a disinterested third party. *Id*. at 19.

In addition to evidence from the acceptable medical sources, an ALJ may also consider evidence from non-medical sources, such as relatives. 20 C.F.R. § 404.1513(d)(4). "Descriptions of friends and family members who were in a position to observe the claimant's symptoms and daily activities have been routinely accepted as competent evidence." *Morgan v. Barnhart*, 142 F. App'x 716, 731 (4th Cir. 2005). The mere fact that a family member is not a neutral party is an insufficient reason to reject her statements. *See Nance v. Astrue*, No. 7:10–CV–218–FL, 2011 WL 4899754, at *11 (E.D.N.C. Sept. 20, 2011), *adopted by*, 2011 WL 4888868.

Neither Farmer's lack of healthcare experience not her lack of impartiality is a grounds to discredit her statements as a third party as to Pettaway's symptoms and limitations. *See Nance,* 2011 WL 4899754, at *11; *Stillwater v. Comm'r of Soc. Sec. Admin.*, 361 F. App'x 809, 812 (9th Cir. Jan. 7, 2010) (noting rejection of ALJ's approach to give no weight to testimony because lay witnesses were not medical experts); *Morgan*, 142 F. App'x at 731 (finding statements from family and friends as to daily activities can constitute competent evidence); 20 C.F.R. § 404.1513(d)(4) (specifically contemplating statements from family members). Nonetheless, her statements are consistent with Pettaway's. ALJ Williams's reasons for discrediting Pettaway's

statements, including a lack of substantial support from objective findings, support a basis for finding her third-party statements deserving of little weight.

### 2. GAF scores

Pettaway next challenges ALJ Williams's consideration of his Global Assessment of Functioning ("GAF") scores. ALJ Williams noted that Pettaway had low GAF scores, but that are merely a snapshot of subjective clinical impressions and that the Commissioner has declined to endorse the GAF scale for use in disability programs. *Id*. at 19–20.

The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). Pettaway's GAF scores ranged from 15–60. *Id*. at 344–423.[6]

The SSA has stated that GAF scores "[do] not have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11–CV–85–FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012) (unpublished) (quotations and citations

---

[6] GAF scores indicate the following:

> 11–20 indicates "[s]ome danger of hurting self or others[,]" a "fail[ure] to maintain minimal personal hygiene[,]" or "gross impairment in communication[.]"
>
> 21–30 suggests "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment, in communication or judgment . . . or inability to function in almost all areas[.]"
>
> 31–40 shows "[s]ome impairment in reality testing or communication" or a major impairment in several areas[.]"
>
> 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)."
>
> 51–60 indicates "[m]oderate symptoms or moderate difficulty in social, occupational, or school functioning."

16

omitted). Moreover, GAF scores themselves are not necessarily indicative of a claimant's mental disability. *See Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) ("A GAF score is thus not dispositive of anything in and of itself" and has no direct legal or medical correlation to the severity requirements of social security regulations.); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) (a GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning."); *Leovao v. Astrue*, No. 2:11-cv-54, 2012 WL 6189326, at *5 (W.D.N.C. Nov. 14, 2012) (a GAF score is intended to be used to make treatment decisions) (citing *Wilkins v. Barnhart*, 69 F. App'x. 775, 780 (7th Cir. 2003)); *Fowler v. Astrue*, No, 1:10-cv-273, 2011 WL 5974279, at *3 (W.D.N.C. Nov. 29, 2011) (a GAF score is only a "snapshot of functioning at any given moment."); *Melgarejo v. Astrue*, No. 08–3140, 2009 WL 5030706, at *2 (D. Md. Dec. 15, 2009) ("[A] GAF score is not determinative of whether a person is disabled . . . [and] [t]he Social Security Administration does not endorse the use of the GAF in Social Security and SSI disability programs, and it does not directly correlate to the severity requirements in the mental disorders listings."). "[T]he failure to reference a [GAF] score is not, standing alone, sufficient ground to reverse a disability determination." *Wiggins,* 2012 WL 1016096, at *8 (quotations and citations omitted).

Here, ALJ Williams accounted for Pettaway's well-established mental deficits and resulting limitations in the RFC, which limited him to simple, routine, repetitive tasks. Tr. at 14. He also referenced the GAF scores contained in the record, but concluded that the low GAF scores were "not supported by the overall medical evidence, which reflects moderate mental problems." *Id.* at 19–20. Although Pettaway had very low GAF score, he also had score of 60, suggesting only moderate symptoms. Given the limited value of GAF scores in a disability

17

determination, and finding that the longitudinal medical record did not support Pettaway's low GAF scores, ALJ Williams properly afforded the GAF scores little weight. Thus, the undersigned determines that ALJ Williams did not err in evaluating Pettaway's GAF scores. His argument on this issue, therefore, lacks merit.

### 3. Objective medical evidence

Pettaway contends that the objective medical evidence supports his allegations of pain. He further maintains that ALJ Williams should not have discredited his claims given his inability to pursue additional medical treatment due to financial constraints.

Pettaway notes that the records demonstrates the following evidence that supports his claims of disabling pain: a March 2014 MRI of his right shoulder showed a complete tear of the rotator cuff and moderate joint degeneration (*id*. at 590–91); a March 2014 MRI of his lumbar spine demonstrated moderate to severe degeneration (*id*. at 740); a coronary angiography in July 2014 showed coronary artery disease, with severe complex disease in his right coronary artery (*id*. at 664); and an x-rays from August 2015 demonstrating multilevel degenerative disc disease of his lumbar spine and mild degenerative changes with arterial vascular calcifications in his left hip (*id*. at 766, 768).

ALJ Williams decision noted the findings of the objective testing. Such findings support his step two determination that Pettaway had several impairments that were severe because they limited his ability to perform basic work activities. *Id*. at 11. ALJ Williams's RFC determination reflects the well-supported limitations and restricts his reaching as well as allowing him to alternate between sitting and standing. *Id*. at 14. The test results cited by Pettaway, while probative of his condition, do not address his functional limitations. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that the diagnosis of a condition, alone, is insufficient

to prove disability, because there must also be "a showing of related functional loss"); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis ... says nothing about the severity of the condition."). Moreover, as noted above, other evidence in the record supports the RFC determination, including an evaluator's opinion that Pettaway could sit, stand, and walk normally in an eight hour workday and Pettaway's generally normal findings upon examination, including normal gait.

Finally, while Pettaway may take exception with ALJ William's lack of pain management records and challenge his professed inability to afford additional care while he spent money on certain vices (tr. at 16), such factors are not irrelevant to a disability determination. *See Hooker v. Astrue*, No. 5:11-CV-243, 2012 WL 7805502 (E.D.N.C. June 28, 2012) (upholding ALJ's credibility analysis which relied, in part, on claimant's purchasing of cigarettes and alcohol in finding claimant less than fully credible); *Magwood v. Astrue*, No. 6:10-2936-MBS-KFM, 2011 WL 6257159 (D.S.C. Nov. 21, 2011) (noting that the ALJ considered the plaintiff's claim that he could not afford treatment, but found the claim was not credible because the plaintiff earned money running errands and was able to buy cigars and alcohol); *Roten v. Astrue*, No. 5:08-CV-089, 2011 WL 4596148, at *6 (W.D.N.C. Mar. 31, 2011), *adopted*, 2011 WL 4596129 (W.D.N.C. Sept. 30, 2011) (finding ALJ's credibility analysis supported by substantial evidence, which included the observation that claimant "spent money on cigarettes"); *Blankenship v. Astrue*, No. 5:07–685, 2009 WL 899426, at *8 (S.D. W. Va. Mar. 30, 2009) (finding the ALJ's credibility discussion, including claimant's ability "to afford a nicotine habit at a pack of cigarettes per day" despite his alleged inability to afford medication, as a factor weighing against claimant's credibility); *Mayle v. Astrue*, No. 9:06–3048–CMC–GCK, 2007 WL 4285383, at *21 (D.S.C. Dec. 3, 2007) (finding ALJ properly considered claimant's purchase of

cigarettes and alcohol when considering claimant's credibility regarding asserted inability to afford treatment). While Pettaway notes that he has been sober since July 2014, part of the applicable period at issue on his application included times where his financial resources were directed towards the consumption of alcohol, drugs, and cigarettes, not to medical care.

Accordingly, the undersigned finds that this issue fails to identify an error in ALJ William's decision.

### III. Conclusion

For the forgoing reasons, the court denies Pettaway's Motion for Judgment on the Pleadings (D.E. 18), grants Berryhill's Motion for Judgment on the Pleadings (D.E. 24), and affirms the Commissioner's determination.

Dated: June 6, 2017

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE